Good morning. It's a pleasure for the Federal Circuit to be here in Colorado and we look forward to hearing arguments in this beautiful courtroom. We have an interesting array of cases on the docket this morning. We have two patent cases, we have a Veterans case, and we have a Vaccine Act case. And we will begin with Appeal No. 2011-1615 INVENTIO v. OTIS ELEVATOR. Good morning, Mr. Ray. Good morning, Your Honor. And may it please the Court. The final ruling that's at issue on Inventio's appeal is set forth at the Joint Appendix on page JA-1233 in Volume 2. It is there where the District Court held that the reasonable royalty state for damages in this case is $163,000. No higher, no lower. And it was based upon some representations about two change orders that apply to two of the seven infringing installations. The two infringing installations at issue with regard to the change orders are 53 State and Lake Mason. Mr. Ray, I understand your argument to be that the claim covers an elevator installation having a plurality of elevators and then the specific detailed circuitry set forth in the body of the claim. And that, therefore, the royalty base should be commensurate with the scope of the claim. Am I correct? That is absolutely correct. And that the entire market value rule doesn't kick in because there is no attempt to establish a royalty base beyond the scope of the claim? Well, that is correct, too. In addition, however, both experts agreed before the motion limiting practice and before the trial that all revenues from the elevator installations should form the base. So the experts were in agreement. And because all the evidence suggested that there was no way to apportion in any way because it would just not be based on the evidence. But there is no difference in the installation that we are talking about in this claim and, for lack of a better expression, conventional elevator installation. There is no difference in terms of the elevator structure, the motors, the doors, all of these components, many of which are very expensive compared with the circuitry. So why is it that when the circuitry is the thing that makes it different, why shouldn't that be the focus in terms of establishing what a royalty base should be? Well, because you should start with the claimed invention. And the claimed invention is not on the circuitry. What if the claim said instead of an elevator installation, it said a building complex? Having six buildings, each of which having an elevator installation, is a royalty base the cost of all of those buildings? Well, no. It could be. And you need to know more. And I need to know what is the patent practicing unit. What is the smallest scalable patent practicing unit? And in this case, there is no question that the smallest patent practicing scalable unit is the elevator installation. And we have no disagreement on that. And we have no disagreement from the two experts. I'm not facing the situation where the patent draftsman might have done what you're suggesting and added the land, the building, the earth. That's not our facts. Our facts, nobody is alleging that this claim is improperly written to include the elevator installation. This invention is integral with the elevator installation. For example… Well, Mr. Ray, let's talk your facts. On page 41 of the brief of the defendant, Cross Appellant, says the St. Regis development includes a hotel and two residential condominium towers. Otis was awarded the contract to install the elevators in all three buildings. But Compass with seamless entry, which is theirs, is being installed only in the hotel and only in five of the twelve elevators. How can the price of such an installation, where the better part of the elevators are non-infringing, be included in your base price for damage? Because at the hypothetical negotiation, they would be. All the evidence shows that at the hypothetical negotiation, which occurs at the time of the first infringement, which is October 2003, agreed upon date, this industry determines royalty bases based on revenue. What may happen in the future, who knows? But the evidence is unrefuted that the royalty base would be revenue. And in fact, if I were to go to Mr. Uhrman's schedule, and Mr. Uhrman's schedule specifically sets forth gross revenue for the very installation you're referring to. So even Mr. Uhrman didn't even make the argument that you're suggesting. So we went into trial with agreement on this point, including the elevators in Florida, which are the ones you refer to. It's just not done that way. And there's many industries where the hypothetical negotiation occurs and it's based on gross revenue. And that was unrefuted in this case. And in fact, Mr. Uhrman was in such agreement that he only nitpicked on one of the seven installations. So yeah, I could see in circumstances where a negotiation may take that into account. There's just no evidence of that here. And so our expert was cross-examined by the district court judge and made it very clear. If you're asking me to apportion, I would have to make up the evidence. It just doesn't exist. And there's no way under this record anyone would think that the hypothetical negotiation would take into account whether or not it's in one elevator, two elevators, five elevators. Weren't some of these elevators subject to a change in work order? So if you have that, if you have a change in work order and that change calls only for the installation of the invention of the circuitry, then aren't we in a position to where we can really identify the value of using the change order for the basis of negotiation? Only if those were our facts. The change order, the evidence on the change orders show, if anything, that it is not the smallest saleable patent practicing unit. The change orders do not reflect the invention at all. And so that's why it's almost insulting to this invention to suggest that the damages adequate to compensate the patent holder is a percentage of $163,000. It's precisely that ruling that we decided to waive our right to trial by jury if the base is only $163,000. But if you go to JA 1233, you will see, for example, exactly why those change orders do not reflect the invention. And in fact, Mr. Bach is discussing this very subject with the court, and he explained that the change order on leg mason does not involve seamless entry. So we know the $100,000 change order with regard to leg mason in no way, in no way, reflects any attribute whatsoever of the invention. And the error by the district court is taking these change orders and somehow thinking, one, they're for seamless entry, which is not true, and two, that these change orders represent the quote, unquote, and this is at 1233 on page 1607, lines 20 through 23. And she says, I do believe that you have some evidence you can give the jury on 53 state and leg mason for the value of the component part that has been found to have infringed your client's patent. That is wrong for many, many reasons. Those change orders would not reflect the invention or be the infringement. You need, for example, you have to have two elevator cars. Everybody agrees you need a plurality of elevators. You would not have an algorithm through the circuitry selecting elevators if you only had one elevator. So you need two elevator cars. We know that's essential to the invention, at a minimum. And nobody is suggesting that the claim invention was sold for these prices. And in fact, Mr. Boffi represented that seamless entry was offered in leg mason for free. For free. The district court responded. He testified it was offered. But the change order says they're going to pay $100,000 for it. Clearly erroneous. That's not correct. How would you distinguish, then, the facts in this case from our decision in Laser Dynamics? In Laser Dynamics, the ODD did have its own marketable value. It was a saleable unit. It was a patent-practicing saleable unit. See, that was a single unit. That was a single piece that was sold that way. And here you have an elevator with the circuitry built into it. You don't have a single piece as you did in Laser Dynamics. Right. The single piece here is the elevator installation. So the smallest saleable patent-practicing unit is an elevator installation. There's no other way to conclude. And that's why under Laser Dynamics, which is this court's most recent pronouncement on patent damages, under Laser Dynamics, the EMDR is a narrow exception to the general rule that you don't get the product unless it is the smallest saleable patent-practicing unit. And to be patent-practicing, you must be infringing. Nobody is suggesting, other than the district court on this page I just read to you, that these change orders somehow reflect parts that would be an infringement. Mr. Ray, I don't want to take up your rebuttal, but I do want to ask you one more question that I'd like you to address. And that is that if you read several of our opinions, Rescunet, Lucent, Unilock, clearly the court is sending the signal that to determine reasonable royalty damages, one must take a realistic, fact-based, economically sound view of the whole landscape to discern what would be properly a reasonable royalty. And I suppose the risk, and perhaps this is the thing that was of greatest concern to Judge McMahon in this case, is that if you use an overly large royalty base, that the risk is that a jury would return a verdict for really an unfair and overly high reasonable royalty. Even a percent applied to a huge number can result in a substantial royalty that may not be justified. Isn't that a concern in this case, and how do we address it if it is? It is not a concern. She was concerned with what she thought was Supreme Court law that required application of the entire market value rule in every case, and that's reflected in her opinion. She thought that my expert plainly relied on the entire market value rule. He did not. And the economic real world facts in this case all lead to the hypothetical negotiation including gross revenue. That's the way it's done in this industry. Doesn't that risk a resulting reasonable royalty calculation that is perhaps disproportionately high? If you start out with a huge number as a royalty base, then you're expecting the fact finder to come up with a reasonable royalty based on a very, very small fraction, 0.1%, 0.01%. And jurors are easily led to say, well, no, it should be 2%, 5%, which could result in a huge royalty, totally disproportionate. Those are not our facts. We do not resemble any of those cases. We have the number one and number two player in the elevator market. This is not a commodity product where there's an NPE suing as in Unilock, as in Lucent, as in Rescue Net. All these cases where there are not market participants. We have the two largest elevator companies in the world here who have license agreements, who use the entire market value as the base. And so those cases just simply do not take into account the kind of situation we have here, and the damages being sought here are very modest, very modest in the single digit millions, not the exorbitant numbers we're seeing in Unilock and Lucent and these other cases. That's not the situation. Would you like to reserve the balance? I would, Your Honor. And I would give you some extra time since I queued up the clock a bit for you. I appreciate it, Your Honor. Thank you. Good morning, Mr. Bach. Good morning. May it please the Court, Andy Bach on behalf of the defendant, Cross Appellant Otis Elevator. Let me start with the issue of damages before I turn to Otis's cross appeal. The district court's application of the entire market value rule case law was a faithful application of this court's precedence. Invenzio simply could not make the required showing that the accused feature was the driver of demand, which the court just reiterated in laser dynamics is the standard. What we're dealing with here is simply a failure of evidence and a failure of proof. Why does the entire market value rule apply in this case? Because the mere presence of the word, I take that Invenzio's argument to the contrary, turns largely on the use of the words elevator installation in the preamble. But the use of the words elevator installation in the preamble does not change the essential fact, which is that these seven installations include hundreds of components, critical components, that indisputably had nothing to do with the invention disclosed in the 094 patent. Things like the cars, the ropes, safety features, counterweights, none of that bears any conceivable relationship to the 094 patent. That's all technical know-how and engineering provided by Otis, that if Invenzio was allowed to use the entire elevator installation as a royalty base, they would capture in that base despite the fact that they had not added that contribution to the technology. Would someone making, using, selling just the circuitry infringe this patent under 271A? I believe you would still need... You would still need an elevator installation. You would still need a controller. The elevator installation, the question of whether the preamble language was limiting was not litigated below because obviously the accused installations were elevator installations. So there's no finding below and there's been no ruling as to whether the preamble language of the elevator installation is limiting. But in the end, it wouldn't change the essential facts for the reason, Judge Lynn, you mentioned in your hypothetical, I felt like you stole my hypothetical. You could always just change the preamble and abstract it one level higher and include the building. Once again, the actual fact of what the patentee invented wouldn't have changed the dramatic expansion of the royalty base nonetheless. Well, I'm not sure I follow what you just said because you can't ignore the words of the claim. I'm not saying, well, you can sort of willy-nilly just put whatever you want in the preamble. You know, the invention is what's in the body of the claim. The preamble is part of the body of the claim. I understand, Your Honor. It may very well be the case that the preamble language is limiting, but that doesn't change the fact that you still would not have many of the components. Indisputably not invented or claimed by this invention that are critical to making the elevator go that are not in any way touched by the 094 claims. Let me give you a different hypothetical. Let's say you have a patent that covers some unique feature on a cell phone. So you can't push two buttons at the same time or something like that. And that is accomplished by a very specific circuit. And the claim says, you know, a cell phone containing this feature, and in the body of the claim it describes that circuitry. Would the royalty base not properly be the price of the cell phone, the accused cell phone? I don't believe it would be the accused cell phone. And the reason is using the cell phone as the base, or here the elevator installation as the base, would in the end undermine the entire purpose of the entire market value, which is to ensure that the patentee is using as its royalty base and claiming as damages what it actually added as a matter of an invention. And so although it may be true. But in my hypothetical, then, how would you discern what the royalty base is if the only thing that the accused is selling are cell phones? Well, I guess first, Your Honor, in Laser Dynamics, the court recently rejected a similar argument that practicality alone is a reason to use the entire market value royalty base. So I think the court has already said that the difficulties of apportionment alone do not justify setting aside the requirements of the entire market value. But there are lots of different ways you can go about it. First, you could look at costs of the components. Is the answer to what Judge Lynn is asking, or isn't the answer found, in whether the circuitry is a core feature of the entire elevator usage? Sure. I mean, obviously, you could posit a set of facts where, in fact, the addition to the cell phone was the driver of demand, and therefore the royalty base would be the cell phone. But I think that you still have to come back to the purpose of the entire market value rule, which is to ensure that the patentee is not claiming in its base things that it didn't add in its invention. And if the issue of the difficulty of apportionment alone was sufficient to allow the patentee to seek damages on the entire market value rule, then Lucent and Unilock would have come out the other way. Because in Lucent, you're dealing with a small feature of Outlook, and there was no price for the date picker function. And nonetheless, the court said you have to satisfy the entire market value rule. So, too, in Unilock, no separate price for the product activation feature. Once again, the patentee argued they should be allowed to use a larger number because it's difficult to apportion. The court still found, even in Unilock, where it was merely used as a check, that that was inappropriate. But in Lucent, the claims were directed to the individual feature, not the overall system. So the entire market value rule, in fact, had a place. But here, and in my hypothetical, the claim covers either the elevator installation or the cell phone. Well, just because the language itself references the broader technology and the broader presence of the technology in elevator installation here, or a cell phone in your hypothetical, might be necessary to prove infringement, doesn't change whether or not Inventio actually invented all of the other components that are necessary to make the elevator system go. Mr. Buck, one of the things Mr. Ray is arguing, and I'm going to want to hear him address, I didn't get to raise this with him, is Mr. Silverstein and his statement that he wanted seamless entry or nothing at all. You have a footnote, 16, that references, it's page 61 of your brief, it references testimony by two employees who said, no, Otis would have got it anyway, that that's not what Silverstein meant. And I want you to address that, because that's his argument about whether it's crucial. And then I want Mr. Ray to respond to you. Sure. On 7 World Trade Center, the installation with Mr. Silverstein, the facts are undisputed that Otis was awarded the project contract without ever offering the accused seamless entry feature. So that's the key fact that shows that it could not have been the basis for demand. In other words, the fact that Mr. Silverstein and the general contractor decided, hey, Otis, $20 million for this elevator project, and then later on decided to add the feature for free, after the contract was already signed, I think is pretty powerful evidence that the initial purchase decision wasn't driven by seamless entry. Add to the separate issue that Invencio has now suggested that perhaps Mr. Silverstein would have breached the contract. There's simply no evidence to that effect at all. If there was evidence like that out there, it would have been easy for Invencio to get, because Mr. Silverstein in New York could have been subpoenaed. And the only evidence was completely one-sided. There was no evidence that there was any danger that Otis would have ever lost this project. Not only that, the contract itself, the termination provision, wasn't Mr. Silverstein's, it was the general contractor's. And if it had been exercised, it would have come at a substantial cost. The whole point of Daubert is to avoid putting experts up there to speculate with no basis in the record, because of the fear that juries will give what they say undue weight. And so the district court was proper in the analysis of Mr. Silverstein and that argument. Let me shift gears and talk a little bit about the small, saleable unit argument that Mr. Ray talked about today. Be brief, and then I want you to address the obviousness question. Sure. I'll just add one important point on the small, saleable unit. The small, saleable unit is not a wholesale exception to the entire market value rule. And if it was, Lucid and Unilock, as I mentioned earlier, would have to come out the other way, because in both cases, the accused small feature was not priced separately. And nonetheless, in both instances, the court indicated the entire market value rule had to be satisfied. On the facts, Mr. Ray is simply not correct, that the issue of whether or not the elevator installation as a whole is a small, saleable unit is disputed. There were two installations where it was added and priced separately, and that's been disputed, 53 State Street, $2.7 million contract. Five years later, Otis sells the seamless entry ad on it. Under Inventio's view, just because the words elevator installation are in the preamble, Inventio gets to sweep in the earlier $2.7 million contract under the royalty base. As we indicated, that simply fails as a matter of common sense. Let me shift gears now to our cross-appeal, focusing, Judge Lynn, as you suggested, on obviousness. The claims at issue here are simply a minor variation of the system disclosed by Schroeder. There's no dispute that Schroeder teaches a destination dispatching system where the card is used to automatically place an elevator call. The dispute is really, would Schroeder, at the starting point, would a skill in the art have known to substitute in RFID card for the card that needed to be inserted in Schroeder? That is exactly the type of minor variation, predictable variation, on known technology that this Court has recognized, time and again, is obvious as a matter of law. The issues on obviousness are very narrow. First, whether or not there was a motivation to combine Schroeder with the RFID art. On that issue, Inventio's own expert acknowledges that one of skill in the art would have known about these RFID references. That's at page 1013 of the joint appendix. I know there's some dispute about whether the RFID art is analogous art. What is your comment on that? Two points on that. One, Inventio is bound by its stipulation. Two, even if they're not, they're wrong on the law. With regard to the stipulation, Inventio stipulated that these references, the RFID references of Lance and Tamada, were prior art. So that was part of the jury instructions. That's joint appendix 1136. Under the district court's instructions, by definition, things that were prior art were analogous. We cite a number of cases for the proposition that Inventio and the district court and this court are bound by that stipulation. But even if there was no stipulation, it's easy to conclude that the RFID references were pertinent to the problem that the inventors of the 094 patent was trying to solve. The problem, as described by the inventor himself, was trying to move away from manual entry of the floor. If you have a system, you're trying to move away from that. You know that Schroeder already teaches you can use a card. You don't love the fact that you have to touch the card to the reader. Where is the logical place to go? Other communications technologies that use cards. So even without the stipulation, as this court has emphasized recently in Wires versus Master Lock, the court should construe the idea of analogous prior art broadly. So it's quite easy to conclude that these references were analogous even without the stipulation. If the combination of Schroeder and RFID was obvious, and that leaves only a single element for all of the assertive claims in dispute, and that's whether or not that combination plus the ordinary skill of one in the art would have disclosed the notion of a storage device coupled between the recognition device and the control device. And on that issue, I think on appeal the briefs have clarified, the dispute is narrowed even further because Invencio agrees, and this is on page 43 of their brief, that it's undisputed that storage devices, that is databases, were known in elevator prior art, and that's YAMI-EC and Schroeder itself. So now we're only talking about the placement of the database within the system. And that sort of minor variation is exactly what the Supreme Court had in mind in KSR when it said that one of ordinary skill in the art is also one of ordinary common sense and problem-solving skills. And this court has held time and again that those sort of minor variations do not save claims from finding obviousness, and indeed the court has said it so many times, we had three cases in the specific context of a database, and that's MySpaces versus Graphon, Western Union versus MoneyGram, and Netscape versus Conrad. So all we're left with is this notion that moving the storage device from here to over here is what saved these claims. I think it's easy for this court to conclude that it should reverse and order judgment as a matter of law for Otis on obviousness. Did you have any objection to the jury charge dealing with the analogous issue? There was no objection because there was no objection by Inventio, no. And obviously we didn't object because we both believe the references are prior art and that the judge's instruction as to what the scope of prior art was was correct. I'll reserve the remainder of my time. Okay. I'll give you your full rebuttal time since I screwed up the clock for you and we'll balance it out with Mr. Ray. All right. We'll give you an extra three minutes. Okay. I will begin with the easiest issue and that is this non-analogous art problem that's been raised. The court made it very clear that there were no stipulations entered for the jury and that's at JA 1128. There were also many jury instructions on whether or not prior art was analogous and there were no objections to the jury instructions. And all we agreed to is that the references were prior art because they were earlier. That instruction that Mr. Bach is referring to comes after the instruction explaining what makes something prior art must be filed more than one year, the William Invention must be published more than one year, and we agreed all the references are prior art in 102 sense. They're early enough. But the trial and the jury instructions are replete with instructions about what makes a prior art reference analogous for use under 103. What if we find that the prior art we're talking about was analogous? Where do you stand then with the obviousness question? Well, one, you'd have to overturn the jury's implicit finding that they weren't. And you have to say there's no substantial evidence for the testimony, which I could cite, where the explanation was that they were not analogous. Remember, Mr. Bach is talking about the problem Dr. Friedli was trying to solve, a genius in the field. The field, as explained by Dr. Dallin and Dr. Friedli, the field was nowhere near looking at those problems. In improving Schindler's destination dispatch system, Otis didn't even think about using destination dispatch until Seven World Trade Center ten years later. But clearly the prior art shows that RFID was known. Oh, that RFID in general was known, yes. And you have Schroeder disclosing essentially the same system that's described in this patent. And the one principal distinction is that there were magnetic cards or other things like that that were used. Why would it not have been obvious to substitute a known RFID for a magnetic swipe card? There are only so many ways you can input these things. Well, first of all, nobody was looking at that. That's the evidence. Number two, that also ignores the location of the storage device. And it also ignores the fact that in Schroeder,  the user's floor, whether it's by button or swiping a magnetic card, where the storage device is on the card. And the testimony was that's no good. That's the same thing as personal action where there's contact, where there's orientation, where there's personal action. These are all the very things. But looking at all the prior art, isn't that common sense to make the jump from the type of activity you're describing, where the user swipes a card, to where you have a card that sends a transmission to the control device? Isn't that just a common sense leap? No, because that's contrary to all the records. If that's such common sense, why did Otis submit patent applications years after ours, telling the patent office that they weren't able to improve the interface? Why would Otis, the number one company in elevators, have to call an outside consultant to figure out how to improve the interface with destination dispatch? Why would they pay a consultant to say, do what Schindler does and use RFID or radio transmissions? Otis couldn't figure it out, and all their patent applications are contrary to what would be in common sense. And Dr. Frieden was truly a genius in this field, and there could be no question that he was a leader in the field. And Otis was at least a decade behind Schindler on the technology front. So to call it common sense is just contrary to the record, and clearly contrary to numerous implied findings by the jury, that they agreed to submit the legal question of Otis to the jury. When I say common sense, I was using that in the manner that the Supreme Court used it in KSR. Well, you still have, the technology here is a little more complicated than some of these common sense cases. Second of all, it still doesn't give you the claim to venture. You still don't have the storage device able to retain all the information on the individual users to have personal elevator services. So that problem is also, so even combining the records, assuming they're analogous, saying one would put them together, you still don't get the claim to venture. But didn't Schroeder say that you could have a storage device on the card? On the card, but that's not coupled between the recognition device. The storage device has to be coupled between the recognition device and the controller. It's not. And that's where all the information is kept on the individual users, not on the card. And the card would be exactly what the inventor was distinguishing on personal action as we discussed in the last appeal. That was the basis of eliminating the user having to manipulate or to enter the information manually. That was the problem. Okay. Before you sit down, would you answer Judge Wallach's question, please? Mr. Silverstein. Yes. The contract is in no way controlling of this issue, whether or not they would so-called lose the sale. The reason why there's no evidence that they would lose the sale is because Otis immediately complied with the request. The request was this. You give me the infringing device, or else you can't bid on other World Trade Center towers. I don't recall it being that way. It was this or nothing, and their interpretation of nothing varied substantially from what you're saying. Yeah, well, we could fight over the interpretation, and we would have a question of fact, but unfortunately the judge acted as a trier of fact on this demand issue. But our primary argument is we're not under the EMBR. We shouldn't be having to show demand, and that's why our primary argument is we're not under the EMBR. And so the evidence on the demand that we presented was only after the district court told us we had to comply with the EMBR because she thought that applied in every case. So the evidence you see is just so happens to be the evidence we had, even though our expert wasn't opining on the EMBR. And the evidence does show what he also said, whether it's an or nothing phrase or not. He also said, if you don't give me the invention, I will not let you bid on one World Trade Center, Freedom Tower. That was the prize. He held that over their heads. He dangled it, as the witness had said. And so there was no fact to suggest anybody would enforce the contract. The fact was to the contrary. Otis yielded immediately and gave them what Larry Silverstein wanted. That should have gone to the jury if we had to litigate that issue. Okay. Thank you very much. Mr. Bach, you have a final word on your cross appeal. Indeed. And we'll give you four minutes. Hopefully I won't need it all, Your Honor. I'd like to make four points in rebuttal. First, in response to the question of whether or not the stipulation was binding as to whether or not Lant and Tamada were analogous. This is from Joint Appendix, page 1135. The jury was instructed that to qualify as prior art to the 094 patent, the references must be reasonably related to the claim of invention of the patent. Two transcript pages later, the jury was also told that there was no dispute that Tamada and Lant were prior art. That stipulation inventio cannot retreat from now. Even if it could, under wires, the Lant and Tamada references were clearly prior art. Let me address now a second point, whether or not the notion of looking to RFID would have been so beyond the skill of one in the art because Freedly himself was an expert. Dr. Downing acknowledged that one of skill in the art would have known of the RFID references. So the notion that somehow this was beyond the competence of the one of skill in the art is contradicted by the record. Schroeder itself, the third point I want to turn to, is that the notion that this invention was a great leap is contradicted by Schroeder itself. So the focus on what Otis was doing, which isn't a fair characterization, is beside the point. Schroeder already disclosed that you could take a destination dispatching system and use a card to place a call. Respectively, that is the core invention that the 094 patent claims with a minor variation of the card system. Fourth and final point on the storage device and its placement. Today we heard again the argument that Schroeder and Yamagishi don't specifically teach the positioning of the storage device between the recognition and the control device. But in addition to, as Judge Rand suggested, an appeal to common sense, what we've never heard at any point, both below or now, is any suggestion by Invenzio as to why that combination yielded unpredictable results or was surprising in the fact that it worked. In fact, it was entirely predictable that taking the system disclosed in Schroeder, which Dr. Dowling, Invenzio's expert, said taught either magnetic strip cards or integrated circuit cards, and changing integrated circuit cards that require contact for a different type of integrated circuit card that required no contact. So, respectfully, common sense is the answer. These claims were obvious to one of ordinary skill in the art. For the reasons set forth today and in our briefs, we would respectfully request this court reverse and enter judgment as a matter of law for Otis on invalidity and on non-infringement. In the alternative, we would ask this court to affirm the district court's rulings on damages in the form of the injunction. Thank you. All right. Thank you very much. I thank both counsel for their arguments. The case is submitted.